IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| FIANCE ALBRITTON #1227150 | § | |
| v. | § | CIVIL ACTION NO. 6:08cv268 |
| NATHANIEL QUARTERMAN, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Fiance Albritton, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding pursuant to 28 U.S.C. 636(c). As Defendants, Albritton named TDCJ-CID Director Nathaniel Quarterman, Warden Thompson, Warden Swift, a physician's assistant named John Nolen, unit classification chief Ms. Frances, hospital administrator Cheryl Kyle, and Dr. Tito Orig. All of theese persons except for the Director are located at the Coffield Unit of TDCJ-CID.

An evidentiary hearing was conducted on February 12, 2008, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985). At this hearing and in his complaint, Albritton stated that due to an accident during a previous surgery, he has to use a catheter. While at the Coffield Unit, he had to use the same catheter for a week, meaning that he had to clean it after each use. However, he did not have access to hot water, and this has caused multiple bladder infections. While he was at the Neal Unit, he said, he got more than one catheter a week, and he had access to hot water. At Coffield, he did not have hot water in his cell, and the other inmates would not let him wash the catheter in the dayroom sink because they used it for food preparation.

Albritton said that he sued Quarterman, Thompson, Swift, and Wheat because of their positions of authority. He stated that Nolen, the physician's assistant, always denied him items that he needed and would not help him. He added that Dr. Orig also would not help him, although he conceded that Dr. Orig had recommended that he be moved to the dormitory, where he would have hot water. Albritton stated that Cheryl Kyle, the hospital administrator, would not help him and said that he was "doing fine" at the Coffield Unit, when in fact he was not. Finally, Albritton said that Ms. Frances, the classification chief at the Coffield Unit, did not move him to the dormitory even after Dr. Orig had said that he should be moved.

In his complaint, Albritton says that the catheters he was issued were supposed to be single-use, but that he had to wash and re-use them anyway. He says that as a result of these conditions, he suffered from frequent bladder and urinary tract infections. Albritton also asserts that these conditions violate the Americans with Disabilities Act. For relief, Albritton asks that he be transferred to a unit where his medical needs could be taken care of, and for monetary damages.

Nurse Barbara Hughes, a correctional nurse also present at the hearing, testified under oath that inmates with catheters would normally receive a disinfectant called Betadine, and that the catheter could be cleansed with Betadine and hot water. She said that Albritton had a pass to go to the medical department and get cleaning supplies on a daily basis. Albritton said that he had only had this pass for two months, and that he never had such a pass at the Coffield Unit; however, Hughes said that the medical records reflected that he had received a pass after he returned from John Sealy Hospital, to which he had gone in October of 2008.

Albritton's Medical Records

The Court has received and reviewed a copy of Albritton's medical records, which are extensive. In reviewing these records, the Court will take Albritton's pleadings and testimony as true, and disregard any factual assertions in the medical records which contradict the factual assertions in these pleadings and testimony.

On November 2, 2007, while he was still at the Michael Unit, Albritton filed a sick call request asking to see a medical provider about his bladder problems, as well as a respiratory infection. He saw a physician's assistant named Sean Hughes, who discontinued some medications that Albritton was not taking, gave him some antibiotics for the respiratory infection and ordered a chest X-ray, and ordered that Albritton be given one 14FR catheter four times a month, as well as KY jelly and Betadine swabs sufficient for one month.

On November 12, 2007, Albritton again saw Hughes, complaining of anal bleeding and lower back pain. An exam found some back pain, and Hughes prescribed a medication called Anusol for reducing swelling and discomfort, a medication called meloxicam for back pain, and a renewal of Albritton's pass for catheter supplies.

On December 6, 2007, Albritton was seen by a nurse named Clardy regarding the renewal of his passes, including a pass for catheter supplies, for solar shield glasses due to blindness in one eye, and a pass for arch support size 13 shoes. He saw Hughes on December 10 with a complaint of ankle pain, and Hughes ordered X-rays for this; Hughes also ordered a catheter pass stating that Albritton could carry a catheter with him at all times in order to perform self-catheterization.

Albritton was transferred to the Coffield Unit on January 8, 2008, due to a "custody overflow" at the Michael Unit. On January 11, 2008, Albritton was seen in the clinic for a sick call request complaining that he had been suffering from kidney pain for two weeks. He stated that he did not know why he was at the Coffield Unit, that he needed to be single-celled because his cellmate did not want him to wash his catheter in the sink, and that he wanted to be able to shower more than once a day due to urine leakage. A urine dipstick test was done, which proved normal, and a pass was issued for Albritton to return to the clinic on January 14 for a provider evaluation. When Albritton saw Nolen on January 14, Nolen determined that he was suffering from sinusitis and gave him an antibiotic called Bactrim, but said that he could not change Albritton's cellmate.

Two weeks later, on January 28, Albritton saw a nurse named Rita Pritchett. At this time, Albritton said he has had to use a catheter for over a year but that he is suffering some irritation, and

3

that he needs hot water to prevent this; he stated that he had hot water at the Michael Unit, and that he needs to be assigned to a unit with adequate facilities for his medical problems. An appointment was scheduled with a provider for the next day, but Albritton was a no-show. He saw a nurse on January 31 with essentially the same complaint, and his chart was referred to Nolen for evaluation and disposition of the complaints.

On February 1, Albritton saw Nolen, who found red and white blood cells in his urine and prescribed an antibiotic called nitrofurantoin, which is usually used for treating urinary tract infections. On February 20, Albritton missed a scheduled clinic appointment.

On February 26, 2008, Nolen sent a request for a referral to the University of Texas Medical Branch in Galveston, asking for a consultation regarding Albritton's urinary problems. Nolen marked the request as "urgent." Nolen also prescribed a medication called surfak (docusate), a stool softener.

On March 2, 2008, Albritton told Nurse Cote that he was still having problems with his urine and wanted to see Dr. Orig, not a physician's assistant. He saw Dr. Orig on March 4, complaining that he had a urinary tract infection because he can't wash his catheter with hot water and his cellmate won't let him wash it in the sink. Dr. Orig prescribed a medication called bethanechol, which aids the bladder in emptying, and ordered that Albritton be allowed to keep this medication on his person. He also ordered a urinalysis and told Albritton that he should report his cellmate to security for not allowing him to use the sink.

On April 1, 2008, Albritton signed a refusal of treatment in which he refused transportation to the urology department of the University of Texas Medical Branch Hospital in Galveston. On April 3, Albritton complained of left kidney pain, and Nurse Gilmartin recorded a verbal order from Nolen ordering that Albritton receive Bactrim and a narcotic pain reliever called Tylenol #3.

A week later, on April 10, 2008, Albritton complained of a chronic kidney infection causing back pain. A verbal order was received from Dr. Orig for Tylenol #3 for seven days, and the first

4

dose was given to Albritton in the clinic; when no side effects were observed, he was released to return to his cell 30 minutes later.

On April 25, 2008, Albritton was seen in the clinic complaining that he only receives a catheter once every seven days and that he was having to clean it in the toilet because he had a cell mate. Albritton acknowledged that he had been moved to a single cell, but said that he still does not have hot water and asked that he be moved to the dorm where there is hot water, or that he receive a new catheter on a daily basis. A pain reliever called ibuprofen was prescribed for him, but he refused a urinalysis. On April 29, Albritton saw Nolen asking about hot water, and Nolen wrote that he would consult with staff about the problem.

On May 2, 2008, Nolen sent an e-mail saying that Albritton's pass for catheter supplies would expire in six months and that Albritton received the same supplies as other catheter patients on the unit. On May 21, 2008, Albritton complained of kidney pain and blurred vision in his left eye. A urinalysis was ordered and Albritton was given antibiotics and Tylenol #3, and he was referred to the optometry department. A follow-up exam was ordered, and the physician's assistant, William Kapela, noted that a referral to the urology clinic in Galveston would be considered.

On May 27, 2008, Albritton was brought to the clinic with a complaint of urinary pain. He was told that he needed to flush his kidneys and bladder, and he replied that this was all that he had been doing and that he was in pain. Nurse Ashford noted that his bowel sounds were active, but that Albritton would not let her finish asking questions. She told him that she would issue him protocol ibuprofen, but he complained that this was all that he had been taking. Albritton then got up from the wheelchair and left the clinic.

On May 30, 2008, Albritton saw Dr. Orig, asking about a referral to the urology clinic. Dr. Orig gave him a recommendation that he be housed in the P6 housing area so that he could have hot water, prescriptions for Bactrim and for Tylenol #3, an urgent referral to the urology clinic in Galveston, and a urinalysis.

On June 19, 2008, Albritton saw Nurse Pritchett, complaining that his left kidney hurt. The nurse noted that Albritton's referral to the clinic in Galveston had been approved and that his appointment was pending, and scheduled him to see a medical provider the next day. On June 20, Albritton saw Nolen, who noted that he had an appointment in Galveston the next month and that he had had multiple Bactrim treatments; he gave Albritton prescriptions for Tylenol #3 and nitrofurantoin. Albritton signed his lawsuit on June 24, 2008.

On July 7, 2008, Albritton saw Nurse Becknal complaining of pain resulting from a bladder infection. She noted that Albritton was taking macrodantin (nitrofurantoin), and the on-call provider said that he should continue doing so. Albritton also received a dose of Tylenol #3.

Three days later, on July 10, Albritton returned to the clinic and saw Nurse Taliaferro complaining of pain in his kidney and left flank, which the nurse noted was "an ongoing medical condition." She gave him ibuprofen and instructions to return to the clinic in 24 hours if the condition did not improve. On July 12, Albritton saw Kapela, who gave him prescriptions for Bactrim and Tylenol #3, a five-day cell pass, and a promise to arrange for reassignment to a unit with hot water available.

On August 8, 2008, Albritton was seen by Nurse Beckler, who noted that she would refer him to a provider because of abnormal urinalysis results. He was seen by Nolen that same day, who renewed his prescription for Tylenol #3 and told him to increase his fluid intake. On September 13, Nurse Gilmartin noted that Albritton was not seen that day because of the suspension of activity due to inclement weather; the unit was functioning at emergency status only.[1]

On September 27, 2008, Albritton was seen in the clinic complaining of a cough, ear drainage, and sinus congestion, and he said that he also thought that he had a bladder infection. Physician's assistant Cheryl Egan ordered a urinalysis and gave Albritton prescriptions for Bactrim and Tylenol #3, as well as cold medicine.

---

[1] This was during Hurricane Ike.

Two weeks later, on October 7, Albritton saw Nurse Ashford, complaining that since he has been taking antibiotics, he has become more ill, including spitting up blood. He said that he has been constipated for days at a time and that he has been feeling weak; he asked to be rechecked by a provider and not simply given more medications. On October 14, Albritton was seen by Nolen, who said that Albritton's urinalysis showed "mixed normal flora."

On October 30, 2008, nurse practitioner Elias Lu made a note in the medical records saying that an e-mail had been received stating that the TDCJ Risk Management Department, the Director of Preventative Medicine, and the Director of Clinical Administration had been consulted, and that it had been determined that system-wide, there were not any general population cells with hot water. Instead, the Health Services Liaison suggested that Albritton receive a daily pass to the medical department to clean his own catheterization equipment. Lu ordered that such a pass be issued.

This pass was apparently issued, although it is not clear exactly when. On November 9, 2008, Albritton walked into the clinic complaining of severe pain to his flank since "the day before yesterday." He said that he had sent in a nursing sick call request a day earlier and that he also has to come in daily to clean his catheter. Nurse Gilmartin noted that orders were received to obtain a urinalysis and for macrodantin, and that Albritton should return for a follow-up appointment. On November 11, Albritton sent in a sick call request saying that he "was bored and tired just sitting in his cell" and wanted to be assigned to a job. He signed "refusal of treatment forms" for work restrictions, including a four-hour work restriction, a sedentary work restriction, and a "no food service" work restriction, so that these could be removed.

On December 12, 2008, Albritton had an appointment to review his medications, and said that he wanted to go to the optometry department. He stated that he needed a refill of medications for his allergies and sinus problems, and that he needed access to hot water and for his work restrictions to be removed so he could get a job. Nurse Pierson noted that Albritton's medications had been renewed by Dr. Orig on December 6 and that Albritton was currently coming to the clinic daily to clean his catheter. She added that Albritton had signed a refusal for the work restrictions

and that his chart has been referred to a provider, but has not yet been seen. Albritton's classification records indicate that these restrictions were removed on December 13, 2008.

## Albritton's Grievances

Albritton filed grievance no. 2008079435 on January 20, 2008, saying that he has asked to be single-celled because no one is willing to share a sink with him, but Nolen said that there was nothing he could do for him. He also said that Major Barbosa refused to house him in the dorm, where hot water was available. The response was that neither hemorrhoids nor the need for self-catheterization met the criteria for single-celling or a transfer to a medical unit.

Albritton filed a Step Two appeal of this grievance, saying that he had previously filed grievances concerning his lack of access to hot water and that he wanted to be moved to a dorm, where he would have access to hot water. He explained all of this to Nolen, and Nolen knew that there was no other logical solution to the problem, but refused to intercede in his behalf. The response to the grievance was that a single cell or medical transfer had not been recommended, but that Nolen had referred him to the urology department in Galveston on February 26 and this referral had been approved on February 29. As noted above, the medical records indicate that Albritton refused an appointment with the urology clinic on April 1, 2008, and he signed a refusal of treatment form to this effect.

In Step One grievance no. 2008136019, which Albritton signed on May 2, 2008, he again complained of being housed in an area where he did not have access to hot water. He says that Kapela recommended that he be housed in the dorm, where hot water was available, and that Nolen also told him that he needed hot water, but that Cheryl Kyle "refuses to follow the rules." The response to this grievance was that Albritton had been evaluated on March 4 by Dr. Orig and on April 29 by Nolen, and that dorm housing is not a medical decision and is not an option on an HSM-18 (health summary for classification) form. The response also noted that there are criteria which must be met before an inmate may be assigned to a dorm. Albritton did not file a Step Two appeal of this grievance.

In Step One grievance no. 2008145301, which Albritton signed on May 14, 2008, he again says that Kapela told him that he needed to have hot water to sterilize his catheter, but Kyle said that she was not going to move him to the dorms, where hot water is available. He says that using his catheter without hot water could be a "biohazard" and asks that he be placed somewhere with hot water available. The response to this grievance was that the medical department does not make housing assignments to dorms, but that this is a classification issue. Dorm assignments are based on security and classification criteria, not medical. Ms. Frances, the chief of classification at the Coffield Unit, stated that Albritton had received a cell change on May 23, and so no further action is warranted. As noted above, this cell change placed Albritton into a single cell, eliminating the problems he had experienced with cellmates. Albritton did not file a Step Two appeal of this grievance.

Legal Standards and Analysis

The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997); Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir. 1989). However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985); Norton, 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim. Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991). Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action. Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993). The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs. Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985). It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).

In Domino v. TDCJ-ID, 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination; the inmate committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Id. Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." Estelle v. Gamble, 429 U.S. 97, 107 (1972). And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Domino, 239 F.3d at 756.

The case of Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999), presents an illuminating picture of what does and does not constitute deliberate indifference to serious medical needs. In that case, the plaintiff Eugene Stewart was incarcerated in May of 1993, at which time he was 67 years old and suffering from numerous ailments, including hypertension, arthritis, gout, and heart disease. In August of 1994, he was admitted to the hospital for treatment of swollen legs, a possible indication of congestive heart failure. He was treated for five days and then released, but the next day, the treating physician, Dr. Dial, was notified that Stewart had a large decubitus ulcer (i.e. a bedsore) on his back. He ordered cleansing of the ulcer, treatment with antibiotics, and placement

on the sick call list; however, it was not clear why such a wound was not discovered during Stewart's stay in the hospital, rather than after his discharge.

Stewart was readmitted to the prison hospital on September 6, 1994, this time under the care of Dr. Kim. She took cultures from the ulcer, debrided the wounds, and administered antibiotics and IV fluids. Dr. Kim also ordered that the dressings be changed three times a day and that Stewart be repositioned every three hours, but acknowledged that due to staffing problems, the nurses sometimes did not carry out the doctor's orders.

Stewart's ulcers did not improved and he was transferred to a non-prison hospital for consultation and treatment. When he returned, Dr. Kim did not follow the free-world physician's advice to transfer Stewart to another facility for physical therapy. Instead, Dr. Kim ordered that Stewart be kept out of bed as much as possible and that the nurses move his extremities. She also transferred him to the care of another physician, Dr. Knutson.

Dr. Knutson treated Stewart's ulcers with medication, ordered that the dressings be changed twice a day, and that Stewart be repositioned every hour. He also checked the wounds periodically and ordered that Stewart get out of bed for extended periods of time.

However, Dr. Knutson conceded that he often did not read the nurses' notes, which said that Stewart had an infection from a catheter, and did not prescribe antibiotics. He did not see Stewart over the Thanksgiving four-day weekend, and saw him next on November 28, 1994, at which time Stewart appeared like he was going to die. Dr. Knutson tried to treat Stewart at the prison hospital but ultimately transferred him to the University of Mississippi Medical Center, where the attending physician stated that Stewart had "the worst bedsores she had ever seen." Stewart died on December 7, 1994.

Stewart's family sued Drs. Dial, Kim, Knutson, and Russell, the medical director at the prison facility. The district court granted summary judgment for the physicians, and an appeal was taken.

On appeal, the Fifth Circuit affirmed the grant of summary judgment. The Fifth Circuit concluded that there was no probative evidence that any of the doctors denied, substantially delayed, or intentionally interfered with treatment.

The dissenting opinion argued that Stewart had not received even rudimentary medical care. The dissent asserts that Dr. Dial was told the day after Stewart was discharged from hospital in August of 1994 that he had developed a 25-centimeter (10-inch) stage IV decubitus ulcer, which Dial apparently had not noticed in five days of treating him. Dr. Dial prescribed a regimen of cleansing, dressing, and antibiotics, but never checked to see if his orders were being carried out or if they were effective. Nor did Dr. Dial review the nurses' notes.

According to the dissent, Dr. Kim found that Stewart had developed multiple decubitus ulcers including a "very deep infection," and gave orders for their treatment. However, the dissent contended that Dr. Kim knew full well that the facility was too understaffed to carry out her orders, but made no effort to carry out a recommendation that Stewart be transferred to a facility where he could receive proper treatment. Finally, the dissent said that the nurses charted numerous symptoms of infection, but Dr. Knutson did not review these notes; although Dr. Knutson observed after Thanksgiving that Stewart had a urinary tract infection, he did not prescribe any antibiotics. Nonetheless, the dissent did not carry the day; the majority concluded that the doctors had provided "active treatment" for Stewart's ailment and that there was no material fact issue to support the requisite deliberate indifference necessary for liability.

In the present case, the medical records show that Albritton has received a significant amount of care for his medical needs. He was recommended for an appointment at the urology clinic in Galveston by Nolen in February of 2008, less than two months after his arrival at the Coffield Unit, but refused to go, for reasons which do not appear in the record. Although Albritton states that he wanted to be housed in the dorms, the grievance responses indicate that there are certain criteria which must be met before an inmate must be assigned to the dorm, and it is not clear that Albritton met these criteria so as to be considered for such assignment; even if he did meet these criteria, there

is no showing that the failure to assign him to the dorm amounted to deliberate indifference to his serious medical needs, rather than mere negligence or carelessness. *See* Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979 (1994) (noting that a finding of deliberate indifference requires a showing that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference, and the failure to alleviate a significant risk which he should have perceived, but did not, is not sufficient). Albritton's claims that the Defendants were deliberately indifferent to his serious medical needs, in the medical treatment he received and the failure to move him to the dorms or otherwise provide the treatment which he believed to be appropriate, are without merit.

Albritton also sues a number of supervisory officials, including Nathaniel Quarterman, Warden Thompson, Warden Swift, and Warden Wheat. He explained at the Spears hearing that he was suing these officials because of their positions of responsibility and authority. The Fifth Circuit has held that lawsuits against supervisory personnel based on their positions of authority are claims of liability under the doctrine of *respondeat superior*, which does not generally apply in Section 1983 cases. Williams v. Luna, 909 F.2d 121 (5th Cir. 1990). A supervisor may be held liable if there is personal involvement in a constitutional deprivation, a causal connection between the supervisor's wrongful conduct and a constitutional deprivation, or if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind a constitutional deprivation. Thompkins v. Belt, 828 F.2d 298 (5th Cir. 1987).

In this case, Albritton has not shown that the Director of TDCJ-CID or any of the unit wardens were personally involved in a constitutional deprivation, that a causal connection existed between wrongful conduct by any of these individuals and a constitutional deprivation, or that any of these individuals implemented a constitutionally deficient policy which was the moving force behind a constitutional deprivation. Thus, his claims against Quarterman, Thompson, Swift, and Wheat are without merit for this reason as well.

Finally, Albritton raised claims under the Americans with Disabilities Act. The pertinent portion of the Americans with Disabilities Act, 42 U.S.C. §12132, reads as follows:

> Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity.

The Act specifically provides that the remedies, procedures, and rights set forth in Section 505 of the Rehabilitation Act of 1973, 29 U.S.C. §794a, shall be the remedies, procedures, and rights this title provides to any person alleging discrimination on the basis of disability in violation of Section 12132. *See* 42 U.S.C. §12133.

To make out a *prima facie* case under the ADA, the Plaintiff must establish: (1) that he is a qualified individual with disabilities; (2) that he was discriminated against by a public entity; and (3) that the discrimination occurred because of his disability. Judice v. Hospital Service District No. 1, 919 F.Supp. 978, 981 (E.D.La. 1996); *see* Blanks v. Southwestern Bell Communications, 310 F.3d 398, 400 (5th Cir. 2002).

The Court will assume *arguendo* that Albritton is a qualified individual with disabilities and that he was discriminated against by a public entity. Even indulging these assumptions, Albritton has failed to show that he was discriminated against *because of* his disability. *See, e.g.*, Davidson v. Texas Department of Criminal Justice, 91 Fed.Appx. 963 (5th Cir., March 19, 2004) (not selected for publication in the Federal Reporter) (affirming dismissal of ADA lawsuit where plaintiff failed to show that he was adversely treated because of his handicap); Shaw v. Texas Department of Criminal Justice, 46 Fed.Appx. 225 (5th Cir., July 17, 2002) (not selected for publication in the Federal Reporter) (inmate denied participation in program for handicapped prisoners because of a notation in his record labeling him a member of a militant organization failed to show an ADA violation because the adverse treatment was not due to his disability). Thus, Albritton's ADA claim must fail.

Even aside from this, it is plain that Albritton's ADA claim lacks merit. The courts have held that a lawsuit under the Americans with Disabilities Act cannot be based on medical treatment

14

decisions. *See* Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1289, 1294 (11th Cir. 2005); Fitzgerald v. Correctional Corp. of America, 403 F.3d 1134, 1144 (10th Cir. 2005); Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) (ADA does not create a remedy for medical malpractice).

Furthermore, the Fifth Circuit has held that there is no individual liability in lawsuits under the Rehabilitation Act, and that individual liability for claims of violations of the Act cannot be secured by casting the lawsuit under Section 1983 rather than under the Act. Lollar v. Baker, 196 F.3d 603, 608-09 (5th Cir. 1999). Because the remedies, procedures, and rights under the Americans with Disabilities Act are the same as those under the Rehabilitation Act, there is likewise no individual liability for claims of violations under the ADA. Washburn v. Texas, — F.Supp.2d —, slip op. no. A-07-CA-116 (W.D.Tex., January 16, 2008) (available on WESTLAW at 2008 WL 170033) (unpublished), *citing* Kacher v. Houston Community College System, 974 F.Supp. 615, 619 (S.D.Tex. 1997); *see also* Bostick v. Elders, --- F.Supp. ---, docket no. 2:02cv291 (N.D.Tex., Jan. 10, 2003) (available on WESTLAW at 2003 WL 1193028); Berthelot v. Stahlder, --- F.Supp. ---. docket no. Civ.A. 99-2009 (E.D.La., October 19, 2000) (available on WESTLAW at 2000 WL 1568224).

In this case, Albritton seeks to vindicate rights under the ADA through the vehicle of a Section 1983 lawsuit, which the Fifth Circuit has said is improper, and he seeks to impose individual liability upon the named defendants for violations of the ADA, which also is improper. Consequently, Albritton's claims under the ADA are without merit.

## Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees. Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989). A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Neitzke v. Williams, 490 U.S. 319, 327, (1989), *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Albritton's complaint lacks any arguable basis in law and fails to state a claim upon which relief may be granted. Consequently, his lawsuit may be dismissed as frivolous under 28 U.S.C. §1915A(b). *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993). It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous. 28 U.S.C. §1915A. It is further

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

So **ORDERED** and **SIGNED** this **6** day of **March, 2009.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE